Charles E. **BELL, Commissioner of Health, et al., Petitioner,**

v.

**LOW INCOME WOMEN OF TEXAS, et al., Respondent.**

No. 01–0061.

Supreme Court of Texas.

Argued Nov. 18, 2001.

Decided Dec. 31, 2002.

Gregory S. Coleman, Weil, Gotshal & Manges, Robert Searls Johnson, Asst. Solicitor General, Jeffrey S. Boyd, Office of the Attorney General, John Cornyn, Attorney General of the State of Texas, Andy Taylor, First Assistant Attorney General, Austin, for Petitioner.

Catherine A. Mauzy, Austin, for Respondent.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice JEFFERSON, Justice SCHNEIDER and Justice SMITH joined.

In this case, plaintiffs challenge certain restrictions the State's Medicaid program places on abortion funding. The program provides medically necessary services for which federal matching funds are available. Before 1976, those services included abortions that were determined to be medically necessary. But after the United States Congress passed the Hyde Amend-ment in 1976, federal funds could no longer be used for medically necessary abortions unless the pregnancy resulted from rape or incest or placed the woman in danger of death. When federal matching funds became unavailable, the State stopped funding medically necessary abortions that did not comply with the Hyde Amendment. Plaintiffs claim that this funding restriction violates the Texas Constitution's Equal Rights Amendment and Equal Protection Clause, and their constitutional right to privacy, because the State applies a higher standard of medical necessity for treatments that involve abortion than it applies to all other medical services.

We hold that the funding restrictions do not discriminate on the basis of sex and are rationally related to a legitimate governmental purpose; thus, they do not violate the Equal Rights Amendment. We further hold that the restrictions violate neither the constitutional right to privacy nor the Equal Protection Clause. Accordingly, we reverse the court of appeals' judgment and render judgment for the defendants.

## I

### Background

#### A. Statutory framework

Since 1965, the federal government's Medicaid program has offered matching funds to states that provide health services to the indigent. Social Security Amendments of 1965, Pub.L. No. 89–97, Title XIX, 79 Stat. 286 (1965) (now codified at 42 U.S.C. §§ 1396–1396v). If a state implements a program that meets certain minimum standards, the federal government will contribute a percentage of the cost of providing indigent health services in the state. 42 U.S.C. §§ 1396–1396b; *Harris v. McRae*, 448 U.S. 297, 308, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). A par-

ticipating state may choose, at its own expense, to provide indigent health services in addition to those which the federal government reimburses, although Texas has chosen not to do so. *See Harris,* 448 U.S. at 311 n. 16, 100 S.Ct. 2671; Tex. Hum. Res.Code § 32.024(e). All states participate in the Medicaid program.

Every year since 1976, Congress has adopted the Hyde Amendment, a rider to the federal Medicaid statute that limits the availability of federal matching funds for abortions. The amendment's language has changed over the years, but the version at issue in this case provides:

> SEC. 508 (a) None of the funds appropriated under this Act, and none of the funds in any trust fund to which funds are appropriated under this Act, shall be expended for any abortion.

> SEC. 509 (a) The limitations established in the preceding section shall not apply to an abortion—

> (1) if the pregnancy is the result of an act of rape or incest; or

> (2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

Consolidated Appropriations Act, 2001, Pub.L. No. 106–554, § 1(a)(1) (enacting H.R. 5656), 114 Stat. 2763, Appendix A, H.R. 5656, Tit. V, §§ 508, 509.

Texas has participated in Medicaid since 1967 through the Texas Medical Assistance Program (TMAP). *See* Medical Assistance Act of 1967, 60th Leg., R.S., ch. 151, §§ 1–24, 1967 Tex. Gen. Laws 310 (now codified at Tex. Hum. Res.Code §§ 32.001–.052). The act implementing TMAP expressly provides that TMAP "may not authorize the provision of any service to any person under the program unless federal matching funds are available to pay the cost of the service." *See id.* at § 5, 1967 Tex. Gen. Laws 312; Tex. Hum. Res.Code § 32.024(e). As a result, the Hyde Amendment applies to prohibit TMAP funding for abortions unless the pregnancy results from rape or incest, or places the woman in danger of death.[1]

## B. The Present Litigation

Three physicians and three clinics that provide abortions filed this lawsuit on behalf of themselves and their Medicaid-eligible patients[2] against the Texas Board of Health, the Texas Department of Health, and Charles E. Bell, the Texas Commissioner of Health (the State).[3] Plaintiffs claim that certain medical conditions may be caused or aggravated by pregnancy, such as premature ruptured membrane, preeclampsia, eclampsia, hypertension, diabetes, congenital heart disease, renal fail-

---

1. This funding limitation is reflected in the Texas Department of Health's regulations and reimbursement manuals. *See* 25 Tex. Admin. Code § 29.1121 (2002); Texas Department of Health, *2000 Texas Medicaid Provider Procedures Manual,* § 33.4.1 *available at* http://www.tdh.state.tx.us/thsteps/tm2000.pdf (last visited Dec. 30, 2002). Plaintiffs did not specifically challenge these provisions in their petition or motion for summary judgment, but instead have focused on the Hyde Amendment itself.

2. Plaintiffs style themselves "Low Income Women of Texas." For simplicity, we refer to them in this opinion as "plaintiffs."

3. The plaintiffs originally also sued the Texas Board of Human Services, the Texas Department of Human Services, and Eric M. Bost, the Commissioner of Human Services, but nonsuited them before trial because they do not administer this aspect of the program.

ure, sickle cell anemia, asthma, epilepsy, and cancer. Some of these conditions cannot be treated while a woman is pregnant. And some of these conditions can, if the pregnancy is not terminated, cause a woman to suffer strokes, severe bleeding disorders, eye disease, heart failure, renal function deterioration, seizures, and accelerated growth of breast cancer tumors. Plaintiffs claim that the State's abortion funding restrictions cause indigent women to delay or forego medically necessary abortions, causing them to either risk or experience harm to their health.

Plaintiffs filed this suit seeking a judgment declaring that TMAP's abortion funding restrictions violate indigent women's right to privacy, and their rights under the Equal Rights Amendment and Equal Protection Clause[4] of the Texas Constitution. They also sought to permanently enjoin the State from enforcing the restrictions. After stipulating that there were no disputed material fact issues, each side moved for summary judgment. The trial court granted the State's motion, and plaintiffs appealed. The court of appeals reversed, holding that TMAP's funding restrictions violate the Texas Constitution's Equal Rights Amendment. 38 S.W.3d 689, 703. The court rendered judgment for the plaintiffs, and remanded their claim for attorneys' fees to the trial court for further proceedings. *Id.* We granted the defendants' petition for review to consider the plaintiffs' constitutional challenges.

## II

### Equal Rights Amendment

#### A. Discriminatory Intent

Texas passed the Equal Rights Amendment to the Texas Constitution in 1972.

4. Although our Constitution does not use the words "equal protection," we have typically referred to the guarantee of equal rights afforded by article I, section 3 by that term.

The Equal Rights Amendment was "designed expressly to provide protection which supplements the federal guarantees of equal treatment." TEXAS LEGISLATIVE COUNCIL, 14 PROPOSED CONSTITUTIONAL AMENDMENTS ANALYZED FOR· ELECTION—NOVEMBER 7, 1972 at 24 (1972). It provides that "[e]quality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin." TEX. CONST. art. I, § 3a. Plaintiffs contend that the abortion funding restrictions discriminate on the basis of sex because the State funds virtually all medically necessary services for men, while refusing to fund abortions that are medically necessary. They further maintain that the restrictions serve no compelling State interest and thus are constitutionally infirm.

■ In *In re McLean,* a plurality of this Court described a three-step process for evaluating alleged Equal Rights Amendment violations. 725 S.W.2d 696, 697 (Tex. 1987) (plurality opinion). That process is consistent with the Equal Rights Amendment's language and purposes, and the parties agree that we should apply it here. In doing so, we first decide whether equality under the law has been denied. If it has, the Equal Rights Amendment's language compels us to determine "whether equality was denied *because* of a person's membership in a protected class of sex, race, color, creed, or national origin." *Id.* If we conclude that equality was denied because of a person's membership in a protected class, the challenged action cannot stand unless it is narrowly tailored to serve a compelling governmental interest. *See id.* at 698.

See, e.g., Barshop v. Medina County Underground Water Conservation Dist., 925 S.W.2d 618, 631 (Tex.1996); Peeler v. Hughes & Luce, 909 S.W.2d 494, 499 (Tex.1995).

In the present case, it is undisputed that the State provides virtually all medically necessary services to indigent men, yet it denies funding for abortions that are determined to be medically necessary. Because the State treats indigent women seeking abortions differently from all others, the plaintiffs have established the first prong of the *McLean* analysis, that is, that equality under the law has been denied. The question we must decide is whether equality has been denied "because of" sex. The State contends that this disparity is not sex based because the funding restriction, section 32.024(e) of the Human Resources Code, is facially neutral and merely prohibits funding any services that are not federally reimbursable. Plaintiffs, on the other hand, look solely to the Hyde Amendment's terms and argue that, because only women can become pregnant, funding is necessarily denied "because of" sex. We believe the question is not as straightforward as either party suggests. In *McLean*, we considered a statutory scheme that treated unmarried fathers differently from unmarried mothers. There, a biological father challenged, under the Equal Rights Amendment, a statute that required an unmarried father who wished to exercise his parental rights over a child to either obtain the mother's consent, or to establish that legitimation was in the child's best interest. Unmarried mothers, on the other hand, could exercise their parental rights automatically and were never subjected to such a requirement. *McLean*, 725 S.W.2d at 697. Because only men were required to obtain consent or satisfy the best-interest test to establish parental rights, the statute expressly created a gender-based distinction, that is, it treated fathers differently because they are male. *Id.*

■ In the present case, it is true that the funding restrictions affect only women, but that is because only women can become pregnant. If the State were to deny funding of all medically necessary pregnancy-related services, the classification might be comparable to the overt gender-based distinction in *McLean*. But while the TMAP, through the Hyde Amendment, denies funding for medically necessary abortions unless certain conditions are met, it does fund all other medically necessary pregnancy-related services. Thus, to say that the State's funding restriction discriminates on the basis of pregnancy, which in turn is gender based, misses the mark. The classification here is not so much directed at women as a class as it is abortion as a medical treatment, which, because it involves a potential life, has no parallel as a treatment method. *See Harris*, 448 U.S. at 325, 100 S.Ct. 2671 ("[a]bortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life."). We simply cannot say that the classification is, by its terms, "because of sex" as it was in *McLean*. But that does not end our inquiry. If the TMAP funding scheme is merely a pretext designed to prefer males over females in the provision of health care, then discrimination "because of sex" is established and the funding restrictions must withstand strict scrutiny to pass constitutional muster. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (noting that discrimination that is "overtly or covertly designed to prefer males over females would require an exceedingly persuasive justification").

In determining whether the TMAP classification is impermissibly sex based, plaintiffs would have us examine only the Hyde Amendment, while the State urges us to consider only section 32.024(e). But we believe the proper focus is the TMAP funding scheme as a whole. That scheme

is based upon the interplay between section 32.024(e), a facially neutral statute, and a federal funding restriction that places indigent women seeking medically necessary abortions in a distinct class. As far as we can tell, no other state appeals court that has considered the issue had before it a statute similarly authorizing the provision of services only to the extent federal matching funds are available.[5]

In *McLean*, the plurality concluded that the statute denied equal treatment "because of sex" because the statute, by its terms, treated men differently from women based solely on gender, but did not discuss how courts should decide the issue when the classification is not so overtly gender based and arises at least in part from a facially neutral law. While the plurality "decline[d] to give the Equal Rights Amendment an interpretation identical to that given state and federal due process and equal protection guarantees," *McLean*, 725 S.W.2d at 697, we find helpful guidance on this particular issue in federal authorities.

■ Under federal law, unless an action challenged on equal protection grounds explicitly creates a suspect classification, a litigant must establish that the action stems from a discriminatory purpose in order to subject the action to strict scrutiny. *See Hunt v. Cromartie*, 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). When a federal equal

---

**5.** Three other state appeals courts have considered challenges under their own Equal Rights Amendments to abortion funding restrictions. Two have held that the restrictions violated their state Equal Rights Amendments. *See Doe v. Maher*, 40 Conn.Supp. 394, 515 A.2d 134 (1986) (holding restrictions unconstitutional under statutory scheme that did not require that services be eligible for federal matching funds); *New Mexico Right to Choose/NARAL v. Johnson*, 126 N.M. 788, 975 P.2d 841 (1998) (holding restrictions unconstitutional where statutory scheme did not require that services be eligible for federal matching funds). One court has upheld them. *See Fischer v. Dep't of Pub. Welfare*, 509 Pa. 293, 502 A.2d 114 (1985). None of these cases involved a provision similar to section 32.024(e). Likewise, none of the other published appellate cases addressing other constitutional challenges to abortion funding restrictions discuss a statute like section 32.024(e) that expressly limits services to those for which federal matching funds are available. *Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904 (Alaska 2001) (holding that denial of funds for medically necessary abortions violates Alaska equal protection guarantee); *Simat Corp. v. Arizona Health Care Cost Containment System*, 203 Ariz. 454, 56 P.3d 28 (2002) (holding that funding restrictions violate Arizona privileges and immunities clause); *Comm. to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 (1981) (holding that funding restrictions violate California privacy and due process guarantees); *Renee B. v. Florida Agency for Health Care Admin.*, 790 So.2d 1036 (Fla. 2001) (holding that funding restrictions did not violate Florida right to privacy); *Moe v. Sec'y of Admin. & Finance*, 382 Mass. 629, 417 N.E.2d 387 (1981) (holding that funding restrictions violate fundamental right to privacy under Massachusetts constitution); *Doe v. Dep't of Soc. Servs.*, 439 Mich. 650, 487 N.W.2d 166 (1992) (holding that funding restrictions do not violate Michigan equal protection clause); *Women of the State of Minn. v. Gomez*, 542 N.W.2d 17 (Minn.1995) (holding funding restrictions violate fundamental right to privacy under Minnesota constitution); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982) (holding that funding restrictions violate New Jersey equal protection provision); *Rosie J. v. N.C. Dep't of Human Res.*, 347 N.C. 247, 491 S.E.2d 535 (1997) (holding restrictions do not affect suspect class or impinge upon fundamental right); *Planned Parenthood Ass'n v. Dep't of Human Res. of the State of Or.*, 63 Or.App. 41, 663 P.2d 1247 (1983) (holding that rule restricting funding violates Oregon privileges and immunities clause), *aff'd on other grounds*, 297 Or. 562, 687 P.2d 785 (1984) (ruling on statutory grounds); *Women's Health Ctr. v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658 (1993) (holding funding restrictions violate express constitutional right to safety).

protection challenge rests upon disparate impact, rather than explicit classification, the federal courts apply the analytical framework the United States Supreme Court first described in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (noting that *Arlington Heights* "set forth a framework for analyzing 'whether invidious discriminatory purpose was a motivating factor' in a government body's decision-making" that federal courts employ under both the Equal Protection Clause and section 5 of the Voting Rights Act of 1965). We recognize that the funding restrictions in this case impact only women, and for that reason, this is not strictly a disparate impact case. But we find the analysis provided in those cases helpful in determining whether TMAP discriminates because of sex.

In *Arlington Heights*, the United States Supreme Court considered an equal-protection challenge to a zoning decision that resulted in the exclusion of low-income housing designed to serve minorities from the Village of Arlington Heights. The Court stated that

> official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." [Citation omitted]. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

429 U.S. at 264–65, 97 S.Ct. 555. According to *Arlington Heights*, determining whether the requisite discriminatory purpose exists "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. Disproportionate impact is one piece of evidence. *Id.* Other factors the Court identified include the historical background providing the context for the challenged action, the specific sequence of events leading up to it, departures from the normal procedural and substantive course, and legislative or administrative history. *Id.* at 267–68, 97 S.Ct. 555. Our consideration of these factors in the present case leads us to conclude that the TMAP funding restrictions are not based on sex.

As we have noted, the State funds virtually all medically necessary procedures for men. Likewise, except for medically necessary abortions, the State funds all medically necessary procedures for women, including those that are pregnancy-related. Obviously, the denial of funding for medically necessary abortions affects only women, at least directly.[6] But, as the Pennsylvania Supreme Court noted in considering a challenge to similar abortion funding restrictions,

> [t]he mere fact that only women are affected by [the restriction] does not necessarily mean that women are being discriminated against on the basis of sex. In this world there are certain immutable facts of life which no amount of legislation may change. As a consequence there are certain laws which necessarily will only affect one sex.

---

**6.** Of course, denying funding for medically necessary abortions potentially affects fathers in a number of ways. If the pregnancy is carried to term, the father will be responsible for supporting the child; if an abortion is privately funded, he may be required to contribute to the cost. And a couple's relationship and family life may be significantly affected if the woman suffers adverse health consequences as a result of the pregnancy. But these potential collateral effects are not the focus of our inquiry.

*Fischer v. Dep't of Pub. Welfare*, 509 Pa. 293, 502 A.2d 114, 125 (1985). That the restriction affects only women might be evidence to weigh in deciding whether it is intended to discriminate against women, but " 'it is not the sole touchstone.' " *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. 555 (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). And other factors identified in *Arlington Heights* indicate that the differential treatment in this case is not "because of sex."

First, the history of TMAP reveals that the Texas Legislature intended to create a program that conformed to the federal program's contours. The now-recodified Medical Assistance Act of 1967 provided:

> It is the intent of the Legislature to make statutory provision which will enable the State of Texas to provide Medical Assistance on behalf of needy individuals of this state and to enable the state to *obtain all benefits provided by the Federal Social Security Act as it now reads or as it may hereafter be amended,* or by any other Federal Act now in effect or which may hereafter be enacted within the limits of funds available for such purposes. . . .

Medical Assistance Act of 1967, 60th Leg., R.S., ch. 151, § 2, 1967 Tex. Gen. Laws 310, 310 (emphasis added). Consistent with that purpose, the Act further provided that "no medical services may be included for which Federal matching funds are not available." *Id.*, § 5, 1967 Tex. Gen. Laws 312. Furthermore, our constitution has long reflected a strong interest in maximizing federal matching funds for medical assistance to the needy. *See* TEX. CONST. art. III, § 51–a(c) (authorizing the Legislature to alter constitutional limits on spending for medical care for the indigent "in order that . . . federal matching money will be available").

Section 5 of the Act is now codified as section 32.024(e) of the Human Resources Code, which expressly prohibits the Department from authorizing any services "unless federal matching funds are available." TEX. HUM. RES.CODE § 32.024(e). This provision was plainly not directed at abortion funding, as abortion was illegal in Texas at the time it was enacted. *See* Act of Feb. 9, 1854, 5th Leg., R.S., ch. 49, § 1, 1854 Tex. Gen. Laws 1502, *superseded by* TEX. GEN.STAT. DIGEST, ch. 7, arts. 531–36, at 524 (Oldham & White 1859). The record contains no evidence that the State has ever deviated from adhering to the matching-funds requirement in administering its Medicaid program. Furthermore, it is undisputed that Texas has consistently funded abortions through TMAP to the extent that federal matching funds have been available. From the time that the Supreme Court struck down Texas's abortion law in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), until Congress passed the Hyde Amendment, TMAP funded all medically necessary abortions. The historical background of the State's creation and administration of TMAP supports the conclusion that the funding restrictions do not discriminate "because of" sex.

Finally, we consider the Hyde Amendment's terms and effect. The State contends that we need look no further than the United States Supreme Court's decision in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). There, the plaintiffs contended that the Hyde Amendment impinged upon their fundamental right to privacy under the United States Constitution by hindering indigent women's ability to obtain abortions. They also claimed that the Hyde Amendment violated the equal protection component of the Fifth Amendment's Due Process Clause by restricting abortion funding

while paying the costs associated with childbirth. The Court rejected both arguments. In assessing the plaintiffs' privacy challenge, the Court differentiated between laws that place "obstacles in the path of a woman's exercise of her freedom," and the government's obligation to remove obstacles such as poverty that it did not create, concluding that "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." *Id.* at 314–16, 100 S.Ct. 2671. The Court also determined that the Hyde Amendment classification is based on financial need, and "[a]n indigent woman desiring an abortion does not come within the limited category of disadvantaged classes so recognized by our cases." *Id.* at 323, 100 S.Ct. 2671 (quoting *Maher v. Roe*, 432 U.S. 464, 470–71, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)). Applying rational-basis review, the Court determined that the Hyde Amendment restrictions were rationally related to the government's interest in protecting potential life and encouraging childbirth. *Id.* at 324–25, 100 S.Ct. 2671.

■ While we find *Harris v. McRae* instructive, it does not control our decision for at least three reasons. First, the Texas Equal Rights Amendment, under which plaintiffs bring their challenge, has no federal constitutional counterpart. Our Equal Rights Amendment was passed many years after the equal protection and due process clauses of both the United States and Texas Constitutions, and it expressly prohibits gender discrimination. Rules of constitutional interpretation dictate that all clauses must be given effect. *McLean*, 725 S.W.2d at 697–98 (citing *Hanson v. Jordan*, 145 Tex. 320, 198 S.W.2d 262 (1946)). Unless the Equal Rights Amendment grants additional protection against gender-based classifications than had been found in the federal and state constitutions at the time it was passed, the amendment was futile. *Id.* at 697; *see also Richards v. League of United Latin Am. Citizens*, 868 S.W.2d 306, 311 n. 3 (Tex.1993). As we have noted, the amendment's legislative history indicates that it was intended to enlarge upon the federal equal protection guarantees. Texas Legislative Council, 14 Proposed Constitutional Amendments Analyzed for Election—November 7, 1972, at 24 (1972). It does so by elevating sex to a suspect class and subjecting sex-based classifications to heightened strict-scrutiny review. *See McLean*, 725 S.W.2d at 698.

Second, while the Supreme Court in *Harris v. McRae* determined that the Hyde Amendment classified based on financial need, it did not specifically consider whether the Hyde Amendment discriminated on the basis of sex. Instead, the equal-protection challenge the Court considered was like the one it addressed in *Maher v. Roe*, where the Court considered "whether the Constitution requires a participating State to pay for nontherapeutic abortions when it pays for childbirth." *Maher*, 432 U.S. at 466, 97 S.Ct. 2376. In both decisions, the Court concluded that the plaintiffs' indigency did not place them in a suspect class. *Harris v. McRae*, 448 U.S. at 323, 100 S.Ct. 2671 ("[T]he principal impact of the Hyde Amendment falls on the indigent. But that fact does not itself render the funding restriction constitutionally invalid, for this Court has held repeatedly that poverty, standing alone, is not a suspect classification."); *Maher*, 432 U.S. at 470–71, 97 S.Ct. 2376 ("An indigent woman desiring an abortion does not come within the limited category of disadvantaged classes so recognized by our cases. Nor does the fact that the impact of the regulation falls upon those who cannot pay lead to a different conclusion."). While

both decisions concluded that the Hyde Amendment did not violate federal equal protection guarantees, neither expressly considered a gender discrimination claim.

We note that the United States Supreme Court has suggested that *Harris v. McRae* established that "the disfavoring of abortion ... is not *ipso facto* sex discrimination." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 273, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). This conclusion is based on the fact that the Court applied a rational-basis test to the alleged discrimination in *Harris v. McRae,* rather than the heightened scrutiny that sex-based classifications have invoked in other gender discrimination cases. *Id.* But given the analysis the Court employed in *Harris v. McRae* and the lack of any discussion of gender discrimination, we feel compelled to perform our own analysis.

Finally, the Court in *Harris v. McRae* considered only the Hyde Amendment, while the TMAP funding scheme we consider involves the interplay between the amendment and section 32.024(e). For these reasons, we must conduct our own analysis to determine whether the TMAP funding scheme, as a whole, discriminates because of sex. In doing so, we note that the Texas Equal Rights Amendment affords greater protection through strict-scrutiny review once gender-based discrimination is found, but it does not affect the initial determination of whether the classification is impermissibly sex based.

Plaintiffs claim that Texas's abortion funding restriction should be considered suspect because "states have historically used women's childbearing capacity as a basis for denying women equality." We don't question that women's ability to become pregnant has historically been "at the root of the discriminatory practices which keep women in low-paying and dead-end jobs." H.R.Rep. No. 95–948, at 3 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4749, 4751. Clearly, the Equal Rights Amendment is directed at just such purposeful gender-based discrimination. But we do not believe the discouragement of abortion through funding restrictions can, by itself, be considered purposeful discrimination against women as a class. As the United States Supreme Court said in *Bray v. Alexandria Women's Health Clinic:*

> [O]pposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women. Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class....

506 U.S. at 270, 113 S.Ct. 753. The biological truism that abortions can only be performed on women does not necessarily mean that governmental action restricting abortion funding discriminates on the basis of gender. As we have said, that might be true if the State refused to fund medically necessary pregnancy-related services. But, other than abortion, the TMAP does fund all medically necessary pregnancy-related care.

The State contends that, even if we ignore section 32.024(e)'s facial neutrality and look only at the Hyde Amendment's abortion funding restrictions, those restrictions implement a legitimate governmental purpose to favor childbirth over abortion. We agree. While the federal constitution prevents the State from placing undue burdens upon a woman's freedom to terminate a pregnancy, the State retains the authority to "make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Maher,* 432 U.S. at 474, 97 S.Ct. 2376. In the absence of any other

evidence of discriminatory intent, we believe that the Hyde Amendment was intended to implement such a value judgment.

We acknowledge that the adverse consequences of TMAP's abortion funding restrictions upon women could give rise to an inference of discriminatory purpose. But "an inference is a working tool, not a synonym for proof." *Feeney,* 442 U.S. at 279 n. 25, 99 S.Ct. 2282. "When ... the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when ... the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof." *Id.* Whatever one might think of the legislative policy choice that the TMAP funding scheme embodies, plaintiffs have simply failed to demonstrate that it reflects a purpose to discriminate because of sex.

### B. Rational–Basis Review

■ Because the TMAP funding scheme does not discriminate "because of" sex, we judge the classification by the more deferential rational-basis standard of review. *Sullivan v. Univ. Interscholastic League,* 616 S.W.2d 170, 172 (Tex.1981). Under this standard, a party asserting that a classification is unconstitutional must demonstrate that the action is not rationally related to a legitimate governmental purpose. *Richards v. League of United Latin Am. Citizens,* 868 S.W.2d at 310–11 (citing *Spring Branch Indep. Sch. Dist. v. Stamos,* 695 S.W.2d 556, 559 (Tex.1985)). This requirement is founded on the principle that legislative action is presumed to be constitutional. *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985) (citing *Texas Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924 (Tex.1985); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983)).

■ Plaintiffs argue that the funding restrictions cannot survive even this deferential level of review because they are not rationally related to TMAP's express purpose to provide medical assistance to needy individuals and allow the State to obtain all benefits provided by the federal act. We agree that the restrictions do not necessarily advance either of those goals. Denying medical assistance does not further the provision of medical services, and the State's ability to collect matching funds for services other than abortions would not be affected if the State elected to fund medically necessary abortions with unmatched State funds. But, as we have noted, TMAP was expressly designed from its inception to fund only those services for which federal reimbursement is available, and an additional legitimate purpose underlies the Hyde Amendment—encouraging childbirth and protecting potential life. The restriction clearly serves those purposes, and it is not for us to second-guess the Legislature's policy choices. See *Maher,* 432 U.S. at 479, 97 S.Ct. 2376 (stating that "[i]ndeed, when an issue involves policy choices as sensitive as those implicated by public funding of ... abortions, the appropriate forum for their resolution in a democracy is the legislature."). Because the TMAP funding scheme is rationally related to legitimate governmental purposes, it does not violate the Equal Rights Amendment.

### III

### Right to Privacy

■ We have recognized that the Texas Constitution protects personal privacy from unreasonable governmental intrusions and unwarranted interference with personal autonomy. *City of Sherman v. Henry,* 928 S.W.2d 464, 468 (Tex.1996); *Tex. State Employees Union v. Tex. Dep't*

of Mental Health and Mental Retardation, 746 S.W.2d 203, 205 (Tex.1987). Plaintiffs claim that the TMAP abortion funding restrictions violate their right to privacy under the Texas Constitution by interfering with the personal autonomy of indigent women. By paying medical expenses for childbirth but not for medically necessary abortions, they argue, the State effectively coerces a woman's decision whether to terminate or continue a pregnancy.

The United States Supreme Court has analyzed similar challenges under the federal Constitution on two occasions. See Harris, 448 U.S. at 312–18, 100 S.Ct. 2671; Maher, 432 U.S. at 472–80, 97 S.Ct. 2376. In those cases, the Court recognized a fundamental difference between governmental action prohibiting abortion, and the government's decision to encourage childbirth as a policy matter. According to the Court, the right of choice recognized under the federal Constitution in Roe v. Wade "d[oes] not translate into a constitutional obligation of [the State] to subsidize abortions. [There is a] 'basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.'" Harris, 448 U.S. at 315, 100 S.Ct. 2671 (quoting Maher, 432 U.S. at 475–76, 97 S.Ct. 2376).

While we have never decided whether the Texas Constitution creates privacy rights coextensive with those recognized under the United States Constitution, we find this distinction persuasive. As the Maher Court observed, "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law." Maher, 432 U.S. at 476, 97 S.Ct. 2376. To say that the State cannot affirmatively restrict certain activities does not mean that the State is not free to employ its resources to encourage activities it deems to be in the public interest. See Maher, 432 U.S. at 479, 97 S.Ct. 2376; Renee B. v. Florida Agency for Health Care Admin., 790 So.2d 1036, 1040 (Fla.2001); Doe v. Dep't of Soc. Servs., 439 Mich. 650, 487 N.W.2d 166, 178 (1992); cf. Norwood v. Harrison, 413 U.S. 455, 462, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) ("It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid."). We disagree with those courts that have concluded that recognizing a woman's fundamental right to choose to terminate a pregnancy imposes a concomitant duty upon the State to fund that choice. See, e.g., Comm. to Defend Reprod. Rights v. Myers, 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779, 799 (1981); Doe v. Maher, 40 Conn.Supp. 394, 515 A.2d 134, 157–62 (1986); Moe v. Sec'y of Admin. & Fin., 382 Mass. 629, 417 N.E.2d 387, 397–404 (1981); Women of the State of Minn. v. Gomez, 542 N.W.2d 17, 29–32 (Minn.1995). As in Maher v. Roe and Harris v. McRae, the funding restrictions here leave "an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if [the State] had chosen to subsidize no health care costs at all." Harris, 448 U.S at 317, 100 S.Ct. 2671. We hold that the TMAP funding restrictions do not violate indigent women's privacy rights under the Texas Constitution.

## IV

### Equal Protection Clause

■ Finally, plaintiffs claim that the TMAP abortion funding restrictions cannot survive rational-basis review under Texas' Equal Protection Clause. TEX. CONST. art. I, § 3. They rely on two cases which they claim suggest that we have "applied a rational basis test more exact-

ing than mere reasonableness," in which the statutory classification must be rationally related not only to a legitimate state interest as required under federal law, but to the very object or subject of the legislation. *See Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985); *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 600–01 (1957). Plaintiffs contend that the abortion funding restrictions create a distinction between health-preserving and life-preserving abortions that is wholly unrelated to TMAP's purpose, which is to protect both life and health.

We do not read *Whitworth* and *Richards* to establish the more exacting standard the plaintiffs suggest. To the extent they might suggest such a standard, we have recently clarified that the federal analytical approach applies to equal protection challenges under the Texas Constitution. *See Rose v. Doctors Hosp.,* 801 S.W.2d 841, 846 (Tex.1990) (stating "Texas cases echo federal standards when determining whether a statute violates equal protection."); *Richards v. League of United Latin Am. Citizens,* 868 S.W.2d at 310–11. Moreover, we believe that plaintiffs oversimplify TMAP's underlying purposes. As we have discussed, the Legislature's intent from the program's inception has been to provide indigent health care only *to the extent that federal matching funds are available.* Even under the more rigorous standard plaintiffs advocate, the TMAP funding restrictions are rationally related to this underlying legislative purpose and do not violate the Texas Equal Protection Clause.

## V

We hold that the TMAP abortion funding restrictions do not violate the Texas Constitution's Equal Rights Amendment, Equal Protection Clause or right to privacy. Accordingly, we reverse the court of appeals' judgment and render judgment for the defendants.

Justice HANKINSON not participating.