# IN THE SUPREME COURT OF TEXAS

═══════════

No. 20-0846

═══════════

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS;
AND RUTH HUGHS, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE,
PETITIONERS,

v.

THE ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST, AND
TEXOMA REGIONS; COMMON CAUSE TEXAS; AND ROBERT KNETSCH,
RESPONDENTS

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════

**PER CURIAM**

JUSTICE GUZMAN filed a concurring opinion, in which JUSTICE LEHRMANN joined.

JUSTICE BLACKLOCK filed a concurring opinion.

## I.

On March 13, 2020, the Governor issued a proclamation under the Texas Disaster Act[1] certifying that "COVID-19 poses an imminent threat of disaster."[2] This triggered several statutory

---

[1] TEX. GOV'T CODE §§ 418.001–.261.

[2] The Governor of the State of Texas, Proclamation No. 41-3720, 45 Tex. Reg. 2087, 2095 (2020).

gubernatorial powers, including the power to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster."[3] TEX. GOV'T CODE § 418.016(a). Since then, the Governor has issued several proclamations affecting the conduct of the 2020 election. The plaintiffs challenge one such proclamation, by which the Governor altered the statutory requirements for hand-delivery of a mail-in ballot.

By statute, "[a] voter may deliver a marked ballot in person to the early voting clerk's office only while the polls are open on election day." TEX. ELEC. CODE § 86.006(a-1). On July 27, pursuant to his statutory disaster authority, the Governor issued a proclamation eliminating the statutory restriction on in-person delivery of mail-in ballots prior to election day.[4] The July Proclamation also directed that early voting begin on October 13, affording voters six additional days to cast their ballots. Texas law allows only certain voters to apply for a mail-in ballot.[5] The July Proclamation gives these voters the option to deliver their mail-in ballots "to the early voting clerk's office." The parties agree that "the early voting clerk's office," as used in the statute,

---

[3] The plaintiffs do not argue that the Disaster Act violates the Texas Constitution.

[4] The Governor of the State of Texas, Proclamation No. 41-3752, 45 Tex. Reg. 5449, 5456–57 (2020) (hereinafter "July Proclamation").

[5] *See In re State*, 602 S.W.3d 549, 559 (Tex. 2020) ("The Legislature has very deliberately limited voting by mail to voters in specific, defined categories: those who will be absent from their county of residence during an election period, who have a 'disability,' who are over 65 years of age, who are incarcerated, or who are participating in the address confidentiality program administered by the Attorney General.") (citing TEX. ELEC. CODE §§ 82.001–.007 and TEX. CODE CRIM. PROC. arts. 56.81–.93).

includes not only the main office but satellite offices regularly used in the ordinary course of the early voting clerk's operations.

On October 1, the Governor issued a proclamation restricting delivery of mail-in ballots prior to election day to "a single early voting clerk's office location that is publicly designated by the early voting clerk for the return of marked mail ballots."[6] The October Proclamation prohibited county officials from designating multiple mail-in ballot delivery sites prior to election day. It left in place the county officials' ability to offer multiple drop-off sites on election day. The Governor determined that the October Proclamation was "appropriate to add ballot security protocols for when a voter returns a marked mail ballot to the early voting clerk's office."

On October 2, several individuals and organizations challenged the October Proclamation in federal court as impermissibly burdening the right to vote. The United States Court of Appeals for the Fifth Circuit rejected the challenge:

> After all, the proclamation is part of the Governor's *expansion* of opportunities to cast an absentee ballot in Texas well beyond the stricter confines of the Election Code. [Under the Code,] mail ballots could be hand-delivered to the early voting clerk only on Election Day. The Governor's July 27 Proclamation effectively extended that hand-delivery option by forty days, and the impact of the October 1 Proclamation can be measured only against that baseline. To be sure, the proclamation requires a single designated drop-off location per county during the expanded forty-day period. But that represents merely a partial refinement of the bounds of a still-existing expansion of absentee voting opportunities. . . . The July 27 and October 1 Proclamations—which must be read together to make sense—are beyond any doubt measures that make it easier for eligible Texans to vote absentee. How this expansion of voting opportunities burdens anyone's right to vote is a mystery.

*Tex. League of United Latin Ams. Citizens v. Hughs*, ___ F.3d ___, ___, No. 20-50867, 2020 WL

---

[6] The Governor of the State of Texas, Proclamation No. 41-3772, 45 Tex. Reg. 7073, 7080 (2020) (hereinafter "October Proclamation").

6023310, at *5 (5th Cir. Oct. 12, 2020) (citations and internal quotation marks omitted) (emphasis in original) (hereinafter "*LULAC*").

On October 5, the plaintiffs[7] in this case brought a similar state-court lawsuit seeking to block enforcement of the October Proclamation. The plaintiffs raise three grounds for relief. First, they claim the October Proclamation was an *ultra vires* act because it exceeds the Governor's authority under the Disaster Act. Second, they claim it infringes the right to vote in violation of Article I, section 3 of the Texas Constitution. Third, they claim it violates Article I, section 3 by disparately burdening voters in large counties. Notably, however, the plaintiffs do not contend the July Proclamation exceeds the Governor's Disaster Act authority; to the contrary, their entire case depends on that proclamation's legal enforceability.

On October 13, the trial court held an evidentiary hearing on the plaintiffs' request for a temporary injunction. On October 15, the court temporarily enjoined the Governor and Secretary of State from "implementing or enforcing" the October Proclamation. The court determined that "[t]he limitation to a single drop-off location for mail ballots would likely needlessly and unreasonably increase risks of exposure to COVID-19 infections, and needlessly and unreasonably substantially burden potential voters' constitutionally protected rights to vote, as a consequence of increased travel and delays, among other things." On October 23, the court of appeals affirmed. No. 03-20-00498-CV, ___ S.W.3d ___, 2020 WL 6265526 (Tex. App.—Austin, Oct. 23, 2020, pet. granted) (mem. op.) (per curiam). The same day, the Governor and the Secretary of State filed a petition for review. Given the immediacy of resolving this dispute, we requested an expedited

---

[7] The plaintiffs, respondents in this Court, are the Anti-Defamation League Austin, Southwest, and Texoma Regions, Common Cause Texas, and Robert Knetsch.

response. We stayed any effect of the court of appeals' judgment. The October Proclamation has remained in effect since the time it issued.

## II.

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Walling v. Metcalf*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam). The party applying for a temporary injunction "must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The applicant must establish each element. We employ an abuse of discretion standard to review the trial court's order granting a temporary injunction. *Walling*, 863 S.W.2d at 58. In resolving evidentiary matters, a trial court does not abuse its discretion "if some evidence reasonably supports the court's ruling." *Henry v. Cox*, 520 S.W.3d 28, 34 (Tex. 2017). But the court has no "discretion" to incorrectly analyze or apply the law. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (noting "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion").

Because it is dispositive of this appeal, we consider first whether the plaintiffs have established a probable right to relief. The State also argues that the plaintiffs lack standing. "Because lack of standing deprives the court of subject-matter jurisdiction," we would normally "address the issue first" before resolving the merits of the plaintiffs' claims. *BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017). When reviewing a temporary injunction, however, we need not resolve the ultimate merits of the plaintiffs' claims in order to determine whether they established a probable right to relief. At this preliminary stage, the plaintiffs must

demonstrate both standing to bring their claims and that the claims will probably succeed on the merits in order to establish a probable right to relief. The failure of either showing means a probable right to relief is lacking and a temporary injunction is unavailable. Because we conclude the plaintiffs' claims are likely to fail on their merits, we need not consider at the temporary-injunction stage whether the plaintiffs have standing. *Cf. Tex. Alliance for Retired Ams. v. Hughs*, No. 20-40645, ___ F.3d___, ___, 2020 WL 5816887, at *2 (5th Cir. Sept. 30, 2020) ("The Secretary's arguments as to standing . . . [and] sovereign immunity . . . are harder to decide on our necessarily expedited review, but we need not reach them because the Secretary has made a strong showing that she is likely to succeed on the merits . . . .").

### III.

As an initial matter, we agree with the Fifth Circuit that the July and October Proclamations expand the options otherwise available to voters. The proclamations cannot conceivably be read as more restrictive than the baseline established by the Election Code. The plaintiffs' complaint is that the latter proclamation is more restrictive than the former. But the plaintiffs do not contend the Governor has a constitutional or statutory obligation to expand voting opportunities at all. They argue only that the limitation on a prior expansion of voting options was itself unconstitutionally burdensome. As the Fifth Circuit observed, however, "[t]he July 27 and October 1 Proclamations—which must be read together to make sense—are beyond any doubt measures that make it easier for eligible Texans to vote absentee." *LULAC*, ___ F.3d at ___, 2020 WL 6023310, at *5 (internal quotations omitted).

No party contends that voters have a constitutional right to multiple locations at which to hand-deliver their mail-in ballots prior to election day. And no party disputes that the Governor's

6

October Proclamation increases the options available to voters relative to the Election Code. In the end, the plaintiffs' complaint is that the Governor ultimately decided not to increase their voting options quite as much as he initially announced. In other words, the plaintiffs' challenge is to the Governor's decision to change from one expansion of voting options to another slightly less generous expansion. These preliminary observations inform our analysis of the plaintiffs' probability of obtaining relief on each of their three claims.

**A.**

The plaintiffs' first claim is that the October Proclamation exceeds the Governor's statutory emergency authority under Chapter 418 of the Government Code. Chapter 418, which no party alleges is unconstitutional, empowers the Governor, in a declared state of disaster, to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business . . . if strict compliance with the provisions . . . would in any way prevent, hinder, or delay necessary action in coping with a disaster." TEX. GOV'T CODE § 418.016(a). In arguing that the Governor lacked statutory authority to issue the October Proclamation, the plaintiffs come perilously close to undermining their own case. After all, they fully embrace the July Proclamation and seek a court order reinstating it. If the October Proclamation is invalid because it intrudes on local officials' prerogatives and alters the rules for mail-in ballots, then the July Proclamation is likewise invalid. The plaintiffs cannot successfully attack the October Proclamation for departing from the Election Code without undermining their desire to reinstate the July Proclamation, which also departs from the Election Code.

The plaintiffs attempt to distinguish the October Proclamation from the July Proclamation by arguing that the latter was validly motivated by concerns about the virus, while the former was

7

improperly motivated by concerns about ballot integrity. The Disaster Act, the plaintiffs contend, does not empower the Governor to suspend statutes for reasons unrelated to the disaster. That may be. But only with blinders on could anyone view the October Proclamation as unrelated to the pandemic. The July Proclamation's expansion of early voting was undisputedly based on the pandemic, and the October Proclamation was merely an adjustment to what was and still is a reaction to the pandemic. The October Proclamation's reference to ballot security offers an explanation for the Governor's action, but the net result is an expansion of voter opportunity beyond that afforded in the Election Code *because of* the pandemic.

If the plaintiffs were correct that each order issued by the Governor during a disaster must be motivated by a desire to alleviate the threat of the pandemic, then the Governor would be powerless to amend or rescind his orders based on other important goals, such as promoting economic welfare, protecting constitutional rights, or ensuring the integrity of elections. He would likewise be incapable of amending an order that may have an undesirable practical consequence unrelated to the disaster. His pandemic orders would operate as a one-way ratchet, moving only in the direction of alleviating the disaster. Nothing in the Disaster Act supports this view of the Governor's authority. Any time an order is issued or amended under the Disaster Act, the Governor must necessarily balance a variety of competing considerations. The Act explicitly authorizes the Governor to amend or rescind his prior orders.[8] Nothing in the Act suggests any limitation on the Governor's ability to consider valid policy goals, such as encouraging economic recovery, preserving constitutional rights, or promoting ballot integrity, when undertaking such an

---

[8] *See* TEX. GOV'T CODE § 418.012 (stating "the governor may issue executive orders, proclamations, and regulations *and amend or rescind them*.") (emphasis added).

8

amendment. The plaintiffs thus have not demonstrated a probable right to relief on their claim that the October Proclamation exceeds the Governor's statutory authority.

**B.**

The plaintiffs next claim that the October Proclamation infringes their right to vote in violation of Article I, section 3 of the Texas Constitution. As explained above, however, the October Proclamation *lowered* barriers to casting ballots during the pandemic relative to the existing Election Code. For this reason, we agree with the Fifth Circuit that the Governor's action may not trigger any judicial scrutiny under federal voting-rights case law. *See LULAC*, ___ F.3d at ___, 2020 WL 6023310, at *5.[9]

Assuming for the sake of argument that the October Proclamation can be understood to burden voting rights at all, it satisfies the standards this Court has previously applied governing judicial review of such actions. This Court has held that the right to vote is protected by Article I, Section 3 of the Texas Constitution. *See State v. Hodges*, 92 S.W.3d 489, 496, 501–02 (Tex. 2002). In reviewing the constitutionality of laws affecting voting rights under this provision, we

---

[9] As the Fifth Circuit observed in considering precisely this issue, "the October 1 Proclamation" may well "not implicate the right to vote at all," *LULAC*, ___ F.3d at ___, 2020 WL 6023310, at *5 n.6, given that the U.S. Supreme Court has rejected the claim that restrictions on the "recei[pt] [of] absentee ballots" interfere in any manner with "the fundamental right to vote." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). Indeed, in just the past few weeks, at least two other federal appeals courts have reaffirmed *McDonald*'s holding "that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot by mail." *Tully v. Okeson*, No. 20-2605, ___ F.3d ___, 2020 WL 5905325, at *1 (7th Cir. Oct. 6, 2020); *accord A. Philip Randolph Inst. of Ohio v. Larose*, No. 20-4063, ___ F. App'x ___, ___, 2020 WL 6013117, at *2 (6th Cir. Oct. 9, 2020); *see also Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring) ("That the State accommodates some voters by permitting . . . casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative"). If the constitutional right to vote does not guarantee a right of voting by mail, then surely it does not guarantee a voter's right to hand-deliver a mail-in ballot to any one of several locations in her county of residence, either.

have borrowed the framework established by the U.S. Supreme Court for reviewing alleged infringements on voting rights. *Id*. A court applying this framework "first consider[s] the character and magnitude of the asserted injury to [voting] rights," and then balances the purported injury against the "interests put forward by the State as justifications for the burden imposed by its rule." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).[10]

Under this "flexible standard," a "severe" impediment to the right to vote must survive strict scrutiny, an exacting standard that places the burden of proof on the government to demonstrate that its restriction is narrowly tailored to achieve a compelling governmental interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The government carries this burden only by establishing "a 'strong basis in evidence,'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986) (plurality opinion)), beyond mere "anecdote [or] supposition"—demonstrating that the restriction on constitutional rights is the least restrictive means of achieving legitimate regulatory goals. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000).

At the same time, the precedent makes clear that not every challenge to voting regulations warrants strict scrutiny. All such "provision[s] . . . inevitably affect[]—at least to some degree— the individual's right to vote." *Anderson*, 460 U.S. at 788. To subject them all to strict scrutiny "would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by [the] State," *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986), put judges in the position

---

[10] Because both parties argue in terms of the *Anderson* balancing test, we assume without deciding that it provides an appropriate framework for the analysis of the plaintiffs' claims under the Texas Constitution.

of "rewrit[ing] state electoral codes," and "hamper the ability of States to run efficient and equitable elections," *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). The courts thus apply much less searching review to election laws "imposing lesser burdens" than to those "imposing severe burdens." *Id.* at 586–87. Such "reasonable, nondiscriminatory restrictions" on the franchise will be "presum[ed] valid" by a reviewing court, and "the State need not establish a compelling interest to tip the constitutional scales in its direction," *Burdick*, 504 U.S. at 434, 439 (quoting *Anderson*, 460 U.S. at 789), or "produce empirical evidence that the harm the statute is designed to avoid has actually occurred," *Hodges*, 92 S.W.3d at 496. Nor does the restriction need to be narrowly tailored to serve its intended purpose. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 365 (1997). Rather, the regulation at issue is valid if it "is a reasonable way" of furthering "a legitimate interest." *Burdick*, 504 U.S. at 440.

Under these standards, the first inquiry is whether the challenged restriction on voting is "severe," which triggers strict scrutiny, or is a "lesser burden" and therefore presumptively valid. The trial court essentially applied strict scrutiny. It faulted the State for failing to produce empirical evidence to rebut the claims of the plaintiffs' experts, who testified that the Governor's ballot-integrity concerns were unfounded and that it would be better pandemic policy to have several locations per county at which to drop off a mail-in ballot before election day. The court of appeals affirmed based primarily on the evidentiary record and the trial court's discretion to credit the views of the plaintiffs' experts. In so doing, the court of appeals, too, effectively applied strict scrutiny, treating the October Proclamation as a "severe" restriction on voting.

This was error. Any burden on voting rights arising from the October Proclamation was not a severe burden, and the proclamation is clearly constitutional when subjected to the

11

appropriate degree of scrutiny under the *Anderson-Burdick* line of cases.  The plaintiffs complain that limiting early hand-deliveries of mail-in ballots to one office per county requires more travel time for some voters.  But this ignores the other options for casting their ballots that these voters have.  As the Fifth Circuit noted:

> [U]nder the Governor's expansion of voting opportunities, Texans can (1) vote early in-person for an expanded period starting on October 13 (as opposed to the previous early-voting period starting on October 19); (2) hand-deliver a marked mail ballot during a forty-day period starting on September 19 (as opposed to the previous one day—Election Day—on which this was permitted); or (3) drop an absentee ballot in the mail.  In light of those options, the October 1 Proclamation's partial refinement of one avenue for absentee voting does not amount to a "severe restriction" on the right to vote.

*LULAC*, ___ F.3d at ___, 2020 WL 6023310, at *6.[11]

The plaintiffs respond by suggesting that voters who opt to put their ballots in the mail "face the risk that USPS does not deliver their mail-in ballot in time."  Even assuming that is true, the risk is small, and voters who are worried about it can mail their ballots in plenty of time before election day to eliminate the chance of untimely delivery.  In any event, the Constitution does not require a state to "afford every voter multiple infallible ways to vote," *id.*; nor would it be possible for a state to foresee and eliminate every possible contingency that might prevent a given voter from casting a ballot.  Thus, the U.S. Supreme Court upheld a voter-identification requirement even though "a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard."

---

[11] *See also Larose*, ___ F. App'x at ___, 2020 WL 6013117, at *2 (upholding Ohio's requirement of one mail-in drop-off location per county as non-severe burden because voters could also opt to "(1) vote in person on election day, (2) vote in-person for more than four weeks before election day, (3) mail in an absentee ballot; or (4) drop off an absentee ballot at a drop box").

*Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 197–98 (controlling opinion of Stevens, J.).[12] Among "life's vagaries" are many risks of this kind, which "are neither so serious nor so frequent as to raise any question about the constitutionality" of a voting regulation. *Id.*; *see also Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (signature verification procedure for voting in referenda was minimal burden despite possibility of erroneous rejections of signatures). Mere "speculation about late-arriving ballots comes nowhere close to rendering Texas's absentee ballot system constitutionally inadequate." *LULAC*, ___ F.3d at ___, 2020 WL 6023310, at *6.

The plaintiffs presented evidence that a voter who wishes to hand-deliver a mail-in ballot before election day at a single location will face difficulties in doing so, including increased risk of exposure to the virus. This burden, however, would fall exclusively on a voter who (1) is eligible to cast a mail-in ballot, (2) credibly fears the mail-in ballot would not arrive on time, (3) could not deliver that ballot on election day to any of the multiple mail-in ballot drop-off locations available on that day, (4) faces substantially greater health risks by voting early in person than by hand-delivering a mail-in ballot early in person, and (5) could not at any time before election day feasibly travel to the single location in the county where early hand-delivered mail-in ballots are accepted.

Concern about this small class of voters does not render the October Proclamation unconstitutional. The U.S. Supreme Court has upheld a voter identification requirement where its

---

[12] Justice Stevens' opinion, though it commanded the support of only three justices, has been recognized as controlling, *see Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 387 (9th Cir. 2016); *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008); *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1222 n.31 (11th Cir. 2020), given that the Court produced no majority opinion, and Justice Stevens concurred in the judgment on the narrowest grounds. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

effects on "most voters" in the state were minimal, despite acknowledging that "a somewhat heavier burden may be placed on a limited number of persons." *Crawford*, 553 U.S. at 198–99. The Court declined to "look[] specifically at a small number of voters who may experience a special burden under the statute and weigh[] their burdens against the State's broad interests in protecting election integrity," explaining that "on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id*. at 199. These observations are no less true here.

The plaintiffs point to the possibility that the small subset of mail-in voters who want to hand-deliver their ballots early may face a lengthy round trip and have to wait in line. The possibility of such "usual burdens of voting" does not, on its own, cast any constitutional doubt on an otherwise nondiscriminatory voting regulation. *Id.* at 198. This is especially the case here, where mail-in voters who wish to avoid the lines and the crowds are free to put their ballots in the mail or to drop off their ballot at one of many available locations on election day.

Because the plaintiffs have not demonstrated that the voting procedures established by the October Proclamation "severely" burden the right to vote, under the *Anderson-Burdick* standard any interference with that right is *de minimis*. The State was thus under no obligation to present empirical evidence to rebut the plaintiffs' claims, and the lower courts erred by requiring otherwise. *See Hodges*, 92 S.W.3d at 496; *Munro*, 479 U.S. at 195–96. The State needed only to articulate an important interest to which the requirement of one early mail-in ballot-delivery location per county is rationally related. *See Burdick*, 504 U.S. at 440. The State easily met its burden: The measure plausibly promotes uniformity of elections and increases confidence in

14

electoral integrity by ensuring that every ballot drop-off location can be properly staffed by poll watchers. It also plausibly decreases the opportunity for fraud in the submission or collection of mail-in ballots. There is no question these are legitimate government interests. Indeed, the Texas Constitution explicitly charges the Legislature to "preserve the purity of the ballot box." TEX. CONST. art. VI, § 4.[13] Limiting the number of drop-off locations—while still expanding voting options relative to the statutory baseline—was a rational means of achieving the valid goals of ballot integrity, fraud prevention, and voter access. The Governor need not prove the efficacy of the regulation with evidence in court. *See Burdick*, 504 U.S. at 440. We agree with the U.S. Supreme Court's admonition that judges reviewing "neutral, nondiscriminatory regulation[s] of voting procedure" should "keep in mind that 'a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Crawford*, 553 U.S. at 203 (quoting *Ayotte v. Planned Parenthood of N. New Eng.,* 546 U.S. 320, 329 (2006)).

The plaintiffs have not established a probable right to relief on their claim that the October Proclamation impermissibly burdens the constitutional right to vote.

## C.

Finally, the plaintiffs claim that the October Proclamation disparately impacts voters in populous counties and voters in geographically large counties, who face the prospect of large crowds or long driving distances if there is only a single drop-off location in each county. Of course, no county in Texas is just like any other, so it is impossible for any statewide voting

---

[13] "In all elections by the people, the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box; and the Legislature shall provide by law for the registration of all voters." TEX. CONST. art. VI, § 4.

15

regulation to identically impact all voters across county lines. Moreover, a policy's disparate impact does not raise concerns of discriminatory classification unless the measure was adopted *because* of, and not merely in spite of, its disparate impact on the affected class. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).[14] The initial burden falls upon the party challenging government action to "prov[e] that discriminatory purpose was a motivating factor" behind that action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977). Plaintiffs here provided no such evidence of intent. *Amicus* alleges, and the court of appeals also suggested, that the proclamation will have disparate impacts on voters depending on their race, yet once again no evidence has been brought to our attention suggesting a discriminatory motive. We presume that public officials act in good faith and without invidious bias in formulating policy, *see Miller v. Johnson*, 515 U.S. 900, 915 (1995), and those challenging the October 1 Proclamation have failed to overcome that presumption.

In Texas's county-based system of elections, county lines are frequently what determines how convenient voting may be for any given voter. The plaintiffs' assertion that the Constitution is violated when voters of one county face slightly greater logistical barriers than voters in another county finds no support in the case law and, if taken seriously, this argument would condemn Texas's county-based election apparatus to interminable litigation over the myriad minor differences between voters' options in various counties throughout our diverse State. The plaintiffs do not have a probable right to relief on this claim.

---

[14] "[T]he federal analytical approach applies to equal protection challenges under the Texas Constitution." *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 266 (Tex. 2002).

## IV.

The Governor's October Proclamation provides Texas voters more ways to vote in the November 3 election than does the Election Code. It does not disenfranchise anyone. The plaintiffs have not established a probable right to an injunction blocking the October Proclamation. As a result, they were not entitled to a temporary injunction, and the trial court erred in granting that relief. The judgment of the court of appeals is reversed, and the temporary injunction issued by the trial court is dissolved.

**OPINION DELIVERED:** October 27, 2020