

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00039-CR

EX PARTE SERGIO HERRERA CAMPOS

On Appeal from the County Court
Kinney County, Texas
Trial Court No. 10863CR

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens
Concurring and Dissenting Opinion by Justice Rambin

## MEMORANDUM OPINION

Sergio Herrera Campos, a noncitizen who was arrested on October 1, 2021, in Kinney County under Operation Lone Star (OLS), was charged with the misdemeanor offense of criminal trespass on a railroad.[1]  Campos filed an application for a writ of habeas corpus seeking dismissal of the criminal charge.  The trial court denied his requested relief.

Originally appealed to the Fourth Court of Appeals in San Antonio, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.).  Pursuant to Rule 41.3 of the Texas Rules of Appellate Procedure, we must follow the precedent of the Fourth Court of Appeals.[2]  As a result, we must "stand in the shoes of the transferor court so that [this] transfer will not produce a different outcome . . . had the case not been transferred."  TEX. R. APP. P. 41.3 cmt.  That said, had we "not been required to decide this case in accordance with the transferor court's precedent," this Court would have decided this case differently.  TEX. R. APP. P. 41.3.

## I.     Background

"On March 6, 2021, Governor Greg Abbott directed the Texas Department of Public Safety ('DPS') to initiate [OLS] and 'devote additional law enforcement resources toward deterring illegal border crossings and protecting . . . border communities.'"  *Ex parte Aparicio*, 672 S.W.3d at 701.  On May 31, 2021, Governor Abbott issued a proclamation and declared a

---

[1]Campos posted a $2,000.00 cash bond and was released from custody by the magistrate on November 18, 2021.

[2]The controlling case of our sister court is presently on review by the Texas Court of Criminal Appeals. *Ex parte Aparicio*, 672 S.W.3d 696, 701 (Tex. App.—San Antonio 2023, pet. granted) (en banc).  Even so, *Ex parte Aparicio* remains the controlling authority in the Fourth Court, and the Fourth Court continues to apply it.  *See, e.g.*, *State v. Rodriguez-Gomez*, No. 04-23-00157-CR, 2024 WL 590425, at *7 (Tex. App.—San Antonio Feb. 14, 2024, no pet. h.).

disaster in thirty-four counties (the OLS Counties), including Kinney County, because of "the ongoing surge of individuals unlawfully crossing the Texas-Mexico border." In the proclamation, Governor Abbott directed "DPS to use available resources to enforce all applicable federal and state laws to prevent the criminal activity along the border, including criminal trespassing, smuggling, and human trafficking, and to assist Texas counties in their efforts to address those criminal activities." By November 2022, the State had devoted more than four billion dollars toward securing the border.

Campos was arrested for criminal trespass as part of that program. *See* TEX. PENAL CODE ANN. § 30.05(a) (Supp.). He then filed a pretrial application for a writ of habeas corpus and argued that the State selectively prosecuted him in violation of his equal protection rights. After initially denying the application without issuing a writ, the trial court granted the application and informed the parties that it would hear the merits by submission of evidence.

In addition to submitting evidence regarding the formation of OLS and the funding of the border security efforts, Campos submitted evidence similar to the evidence submitted in *Ex parte Vazquez-Bautista*, *State v. Gomez,*[3] and *Ex parte Aparicio*.[4] *See Ex parte Vazquez-Bautista*, 683 S.W.3d 504, 507–09 (Tex. App.—San Antonio 2023, pet. filed) (en banc) (op. on reh'g); *State v. Gomez*, No. 04-22-00872-CR, 2023 WL 7552682, at *1–3 (Tex. App.—San Antonio Nov. 15, 2023, pet. filed); *Ex parte Aparicio*, 672 S.W.3d at 701–06.

---

[3]The evidence in the case at bar included the transcript of the habeas corpus hearing held in *State v. Gomez*.

[4]The evidence in the case at bar included the transcript of the habeas corpus hearing held in *Ex parte Aparicio*.

The State submitted (1) the affidavit of DPS South Texas Regional Director Victor Escalon, (2) the affidavits or sworn statements of more than two dozen residents of Texas border counties, (3) fifty-nine photographs, and (4) documents evidencing the arrest and prosecution for criminal trespass of five persons with presumptive female names that occurred in October 2022 and September 2023.

After the parties submitted their briefs and evidence, the trial court entered its judgment denying Campos relief. The trial court included findings of fact and conclusions of law in its judgment that relied principally on Escalon's affidavit.[5]

On appeal, Campos asserts that the trial court erred in denying his requested relief because (1) he "properly raised his selective-prosecution claim in a pretrial writ of habeas corpus," (2) he met his burden of establishing a prima facie claim of selective prosecution based on sex discrimination, and (3) the State failed to meet its burden of justifying its discriminatory conduct under the United States or Texas Constitutions.

## II.    Discussion

In *Ex parte Aparicio*, the San Antonio Court of Appeals, sitting en banc, determined that a selective prosecution claim on the basis of equal protection is cognizable in a pretrial habeas proceeding. *Ex parte Aparicio*, 672 S.W.3d at 713. That court has consistently followed its holding in *Ex parte Aparicio* and consistently rejected the same arguments made by the State in this case. *See, e.g.*, *Ex parte Vazquez-Bautista*, 683 S.W.3d at 510; *Gomez*, 2023 WL 7552682, at *4; *State v. Del Campo-Chavez*, 674 S.W.3d 714, 717 (Tex. App.—San Antonio 2023, pet.

[5]The trial court adopted Escalon's affidavit as part of its findings.

4

filed).  Based on the precedent of the San Antonio Court of Appeals in this transfer case, we hold that Campos's pretrial habeas claim is cognizable in an interlocutory appeal.

Campos also argues that he met his burden of showing a prima facie case for selective prosecution based on sex discrimination.  In *Ex parte Vazquez-Bautista*, the San Antonio Court of Appeals noted that it had previously "considered whether a noncitizen who had been charged with trespass under OLS had met his burden of stating a prima facie case for selective prosecution on the basis of gender discrimination."  *Ex parte Vazquez-Bautista*, 683 S.W.3d at 510–11 (citing *Ex parte Aparicio*, 672 S.W.3d at 715).  Because the evidence in *Ex parte Vazquez-Bautista* was "similar to the evidence presented in *Aparicio*," *id.* at 511 (citing *Ex parte Aparicio*, 672 S.W.3d at 701–06), and because the State's arguments were the same in both cases, the court "conclude[d] Vazquez met his burden of proving a prima facie case for selective prosecution on the basis of gender discrimination," "for the same reasons enunciated in *Aparicio*," *id.* (citing *Ex parte Aparicio*, 672 S.W.3d at 713–15).

Likewise, the evidence submitted by the writ applicant here to show discriminatory effect and discriminatory purpose is similar to the evidence presented in *Ex parte Aparicio* and *Ex parte Vazquez-Bautista*.  As a result, based on the precedent of the San Antonio Court of Appeals, we find that Campos met his burden of establishing "a prima facie claim for selective prosecution on the basis of gender discrimination."  *Id.* (citing *Ex parte Aparicio*, 672 S.W.3d at 715).

In *Ex parte Vazquez-Bautista*, the San Antonio Court of Appeals noted that, "even though given an opportunity, the State failed to present any evidence of the feasibility of the State to

5

bear the financial burden of arresting, housing, and prosecuting women, as it did by modifying its existing facilities to house male detainees." *Id.* at 513 (citing *Gomez*, 2023 WL 7552682, at *5). As a result, the San Antonio Court of Appeals found there was "no evidence . . . to support the State's assertion that OLS [wa]s 'narrowly tailored to serve its compelling interest of border security.'" *Id.* (quoting *Gomez*, 2023 WL 7552682, at *5). Consequently, the court held that "the trial court abused its discretion in denying Vazquez relief on his selective prosecution claim under the Texas Equal Rights Amendment." *Id.* (citing *Ex parte Perusquia*, 336 S.W.3d 270, 274–75 (Tex. App.—San Antonio 2010, pet. ref'd)). Based on this same lack of evidence, the San Antonio Court of Appeals held that the record did not "support the State's assertion that its discriminatory conduct is substantially related to its important governmental interest of border security," as required to pass intermediate scrutiny under the United States Constitution for gender discrimination. *Id.* at 514 (citing *Gomez*, 2023 WL 7552682, at *6).

Although the State submitted evidence in this case, the evidence submitted suffered from the same deficiency relied on by the San Antonio Court of Appeals in *Ex parte Vazquez-Bautista* in determining that the State did not meet its burden under the Texas Equal Rights Amendment (ERA) or the United States Constitution. As a result, based on the precedent of the San Antonio Court of Appeals, "even in reviewing the facts in the light most favorable to the trial court's ruling, we hold the trial court [erred] in denying [Campos] relief on his selective prosecution claim under the Texas Equal Rights Amendment," *id.* at 513, and "on his federal equal protection selective prosecution claim," *id.* at 514.

6

## III.  Conclusion

While the outcome of this case would have been entirely different had we not been required to decide this case in accordance with another district's precedent, faithful application of Rule 41.3 of the Texas Rules of Appellate Procedure requires us to reverse the trial court's order and remand this cause to the trial court for further proceedings consistent with this opinion.


Scott E. Stevens
Chief Justice


CONCURRING AND DISSENTING OPINION

> Since July 2021, I have been working with State and Federal OLS partners to increase jail space capacity, including to house more female arrestees.

Those are the words of Victor Escalon, the DPS's South Texas Regional Director, in an affidavit concerning the State's response to an overwhelming, multifaceted problem.

The record before us shows that 2021 set "an all-time record" for illegal border crossings whereas just the year before, in 2020, the State had experienced "the fewest illegal [border] crossings in decades."  This gave rise to a situation which Governor Abbott has declared "a humanitarian crisis," an "invasion," and a "disaster."

"Operation Lone Star," or OLS, began on March 6, 2021, as a directive by Governor Abbott to the DPS to respond to the increase in illegal border crossings.  On May 31, 2021, OLS expanded; Governor Abbott declared a disaster in thirty-four counties on or near the border with Mexico.

7

The record in this case contains affidavits from more than two dozen residents of the OLS border counties, including Kinney County. Time and again, these affidavits speak of the danger presented by men. For example, one Kinney County resident states that thirty-five men were apprehended on his ranch in October 2021. In his estimation, "[ninety] percent of these groups that trespass thru the ranch are military age males." The trial court found that these affidavits "tell a terrifying and compelling story of the effect of the surge beginning in 2021."

Regional Director Escalon states: "Since OLS'[s] inception, DPS leadership has adapted its practices . . . to protect Texans as best it can while triaging limited resources like jail space." As part of that triage, as of 2021, women were arrested and prosecuted for felony offenses, but not for misdemeanor criminal trespass. Escalon says there were "many factors" in that decision. One of them being the assessment that adult male trespassers presented a greater threat than female trespassers, an assessment that, in turn, was based on multiple factors.

Campos was arrested for criminal trespass on October 1, 2021, as part of OLS. He was arrested along a railroad in Kinney County. There is no indication in the record of whether he was with a group that included women, or whether he was in a group at all. He was thirty-six years old at the time. He asserts, via an application for pretrial writ of habeas corpus, that he has been prosecuted, while women have not, in contravention of his rights to equal protection under the Constitutions of both the United States and Texas. He asks that the case against him be dismissed.

The trial court did not dismiss the case. The trial court granted the writ, but denied the relief requested. The trial court made detailed factual and legal findings. The trial court found

8

that the "swift surge in illegal crossings" accompanied by "cartel involvement . . . created a crisis for law enforcement akin to a tsunami." The trial court found that the decision to prosecute men for criminal trespass was not motivated by a prohibited discriminatory purpose, but instead was based on an assessment that adult males posed the greatest danger, and on a lack of jail space for women. The trial court found Regional Director Escalon's affidavit "credible" and "adopt[ed his] affidavit as part of its findings." The trial court specifically credited Escalon's statement that, from the beginning, the State was trying to ramp up jail space for women to meet the "tsunami." The trial court found this conclusion supported by the fact that, in 2023, jail space for women had become available, and women too were then prosecuted not only for felonies, which they had been all along, but also for criminal trespass.

There have been numerous OLS cases. This case was transferred to our Court pursuant to standing docket equalization practices of the Texas Supreme Court. We are, therefore, required to decide the case based on how our sister court would decide it.

This case, however, has three things no prior Fourth Court OLS decision has had: (1) the affidavit of Regional Director Escalon, (2) the affidavits from OLS border-county residents, and (3) a decision from the trial court denying habeas relief in reliance on those affidavits.

Even so, it appears that the rulings of our sister court on prior OLS cases mandate that the trial court be reversed. I concur in that outcome, as I must.

The same rule which requires our court to follow the precedent of our sister court also gives our court latitude to state that we would decide the case differently. As indicated by the main opinion, our entire court would decide this case differently. Given the substantive legal

9

standards regarding selective prosecution, and under the governing standard of review, abuse of discretion, I would affirm the trial court's decision as being within its discretion and supported by the record. I therefore dissent.

## I. The Governor's Proclamation

"The Governor is 'the Chief Executive Officer of the State.'" *Abbott v. Harris Cnty.*, 672 S.W.3d 1, 18 (Tex. 2023) (quoting TEX. CONST. art. IV, § 1). "The Disaster Act[6] envisions a coherent statewide or regional governmental response to a disaster, which cannot be accomplished without clear lines of authority coordinating Texas's patchwork of overlapping local jurisdictions." *Id.* at 18–19. The Disaster Act serves as delegation of the Legislature's powers to the Governor. *Id.* at 16–17.[7] The Governor's Proclamation, pursuant to the Disaster Act, constitutes a finding by the Chief Executive Officer of the State. TEX. GOV'T CODE ANN. § 418.014(a). The Governor's Proclamation has "the force and effect of law." TEX. GOV'T CODE ANN. § 418.012. On May 31, 2021, Governor Abbott proclaimed that:

- The State is experiencing "escalating border crossings."

- The Governor's "calls for the federal government to do its job and secure the border have gone unanswered."

- This has "enabled escalating violence from the cartels, dramatically increased the risk of human trafficking, and created a severe crisis of illegal drugs crossing into the United States including 21.5 million lethal doses of fentanyl that were

---

[6]TEX. GOV'T CODE ANN. § 418.001 *et seq*. "The [L]egislature by law may terminate a state of disaster at any time." TEX. GOV'T CODE ANN. § 418.014(c). The record in this case reflects no such action by the Legislature. Instead, the record contains an April 29, 2022, letter by Governor Abbott co-signed by Lieutenant Governor Dan Patrick, Speaker of the House Dade Phelan, Senator Joan Huffman, and Representative Greg Bonnen, M.D. The letter approves the transfer of Texas General Revenue funds to the Governor's Disaster Funds.

[7]Noting, but expressly avoiding deciding, the constitutional question raised by such delegation.

10

intercepted by DPS from January through April 2021, all of which threatens harm throughout Texas and in other states."

- The result has also been "a humanitarian crisis in many Texas communities along the border."

- In the months prior to the Disaster Declaration, the Governor had directed the DPS to "initiate Operation Lone Star" and "devote additional law enforcement resources towards deterring illegal border crossings and protecting our border communities." Those efforts resulted in

  - the apprehension of "over 35,000 illegal migrants;"
  - "1,300 criminal arrests;" and
  - the seizure of "over 100 firearms," and "10,000 pounds of drugs."

- In sum, "the ongoing surge of individuals unlawfully crossing the Texas-Mexico border poses an ongoing and imminent threat of widespread and severe damage, injury, and loss of life and property, including property damage, property crime, human trafficking, violent crime, threats to public health and a violation of sovereignty and territorial integrity" in the designated counties.

"The People elect legislative and executive branch officials—not judges or 'experts'—to make judgments about the costs and benefits of government action and to balance competing policy goals in light of those judgments." *Harris Cnty.*, 672 S.W.3d at 5 (quoting *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 926 (Tex. 2020) (per curiam) (Blacklock, J., concurring).

The Proclamation acknowledged that "there may not be an adequate number of jail beds available" and directed the Texas Commission on Jail Standards and the Texas Commission on Law Enforcement to assist with the response.

The trial court relied on the Governor's Proclamation.[8]

---

[8]Notably, Campos asserted to the trial court that the Governor's Proclamation "sets out the motivation for [OLS]. [The] declaration does not mention the sex of the unlawful crossers once."

11

## II.    Regional Director Escalon's Affidavit

Victor Escalon has been the DPS's South Texas Regional Director since 2019. He has directed OLS's mission in the twenty-seven county South Texas Region since the beginning. Today, he oversees more than 1,600 employees. In 1994, he started his DPS career as a trooper. In the three decades since, he advanced through the ranks, from undercover narcotics officer in Laredo, to supervising "rural operations to dismantle and disrupt criminal organizations operating on both sides of the [Rio Grande]," to headquarters positions as a Texas Ranger Division Captain and then Ranger Major, with duties involving oversight of units including, among others, the Border Security Operations Center. These duties required coordination with federal, state, and local authorities on border security.

In his seven-page, single-spaced affidavit, Regional Director Escalon explains why, from 2021 until 2022, men were arrested for criminal trespass, but not women, and why, presently, the focus regarding criminal trespass is on "single adult male *and female* violators between the ages of 18 and 65." (Emphasis added).

The background for that decision is that, since early 2021, there has been an "influx of undocumented migrants" which has "overwhelmed the criminal justice system in the South Texas Region." Data from before 2021 showed that those trespassing in remote rural areas were predominately men. In 2021, the number of such "trespass[ers] increased at an alarming rate." By contrast, "[f]ew females were being encountered." Regional Director Escalon states that State and federal data gathered since the initiation of OLS bear out that most trespassers "are males, not females." He states that his experience is that trespassers hope to avoid detection and

12

capture. Sometimes this is because they want to meet a human smuggler at a remote location, and from there be taken to "transportation hubs, like San Antonio and Houston." Sometimes this is because they are smuggling drugs. Escalon stated that a consideration present from the outset of OLS is that "[t]he public safety threat posed by cartels, drug and human trafficking organizations, and associated gangs increase[s] as these actors take advantage of increased illegal migrant flows to conduct their criminal activities, including human smuggling, human trafficking, narcotics trafficking, weapons trafficking, money laundering, extortion, and violent crimes." For numerous reasons, the DPS considered "non-elderly adult male[s]" to present "the greater public safety threat."

No matter the reason for traversing remote areas, the trek involves risks such as exhaustion and dehydration. In Regional Director Escalon's words, "[t]here are public safety concerns for the trespassers themselves." "In just the South Texas Region, hundreds of dead trespassers have been recovered on private property. Most of them have been male."

Women, according to Regional Director Escalon, typically follow a different pattern. From both his own personal observation and data reported to him, he states that women and family units are less prone to trespass, but instead, are more prone to cross into Texas at "designated Ports of Entry" where "the city provides more infrastructure on both sides of the river."[9] When women are encountered on rural property it is difficult to tell whether they are trespassing or they are "being smuggled or trafficked by their male companions."

---

[9]*See Jennings v. Rodriguez*, 583 U.S. 281, 285 (2018) (plurality op.) ("Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official 'port of entry' (*e.g.*, an international airport or border crossing) or who have been apprehended trying to enter the country at an unauthorized location.").

Given 2021's alarming increase in trespassing, Regional Director Escalon states that OLS initiated an emphasis on arrests for criminal trespass in July 2021. This required ongoing coordination with local and federal authorities through the stages of arrest, processing, and detention, within the State system, and then federal Immigration and Customs Enforcement custody. Variables such as the place of arrest and the nature of the offense impacted where arrestees would go in the process. When processing or detention facilities had no more capacity, arrestees would be handed directly over to United States Customs and Border Patrol. "Many South Texas Region jails, like in Kinney County, have not been operational since OLS's inception." Escalon notes the "logistical hurdles" involved because "the Texas Commission on Jail Standards requires women and men to be house[d] separately."

Regional Director Escalon states that, from the beginning of OLS, women have been arrested for felony offenses, local jail space permitting. However, "limited jail space has forced DPS personnel to release male and female arrestees." He also states that, in November 2022, DPS personnel began arresting women as county jail space became available. Further, by July 19, 2023, the State had readied the Lopez Unit in Edinburg, Texas, to house "adult females who have committed criminal trespass and other border nexus-related State crimes."[10]

---

[10]Here, Campos asked the trial court to consider facts which developed after his arrest. That takes this case outside of our sister court's holding that the only "evidence relevant to [a] . . . selective-prosecution claim is that which existed at the time of the applicant's arrest." *Ex parte Barahona-Gomez*, No. 04-23-00230-CR, 2023 WL 6285324, at *2 (Tex. App.—San Antonio Sept. 27, 2023, pet. filed) (mem. op., not designated for publication). In particular, Campos asked the trial court to consider the subsequent arrests and prosecutions of women in hopes that it would persuade the trial court of the State's discriminatory intent at the time of his arrest. Having done so, Campos cannot complain when the evidence he put before the trial court has the opposite effect of demonstrating Escalon's sincerity. *See Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental.").

The trial court found Regional Director Escalon's affidavit credible and adopted it as part of its decision.

### III.	The OLS Border County Resident Affidavits

Cole Hill manages a working cattle and hunting ranch in Kinney County. He has lived on the ranch with his wife and three children since 2015. He states that since January 2021, he has experienced "increasingly aggressive confrontations" with trespassers. He recounts a young male "fully dressed in nice camouflage from head to toe" trying to enter the barn at the ranch headquarters. There had been occasional trespassers before, but none had approached the headquarters. In February 2021, a group of trespassers surrounded Hill's house while his wife and daughter were inside. The trespassers were banging on the doors and trying to find a way inside. The trespassers did not respond to pleas that they leave until Hill returned home and told the trespassers that he had called the Border Patrol. Later, in February 2021, Hill discovered that an eight-foot-tall section of his ranch fence had been cut. Tracks indicated that a vehicle had entered, picked up a group, and then left through the cut opening. Hill had to repair the fence immediately lest cattle discover it and exit the ranch onto the nearby highway, endangering motorists. By April 2021, Hill had decided that it was not safe for the children to play outside unless he was home. Hill had just started mowing the yard when he saw five male trespassers crawling under the fence by the barn and then running for his house. Hill yelled at his children to get inside and yelled at the men to stop. The men kept running towards Hill's home. They did not stop until Hill won the footrace to his house, got a shotgun he had started keeping just inside the front door, and "racked a round."

15

Hill describes multiple incidents of trespassers breaking into a ranch workers' residence and the main hunting lodge by breaking windows and kicking in doors. The trespassers left the ranch house "trashed" and the lodge "completely ransacked" with the damage including human feces. The trespassers stole hunting gear including camouflage, spotting scopes, and knives.

Hill states that "[a]pproximately 95%" of trespassers were "young males." Regarding the "few women that have come through," Hill states: "I have found 2 abandoned by their coyote and left for dead with no food or water. One had been raped repeatedly on her trip, and the other had a broken leg and a broken arm."

Beth Ann Smith, a fifty-two-year Kinney County resident, also states that what began happening in 2021 is something she has never experienced before. She describes cut fences, cut water lines, and ranch-house break ins. She has had trespassers "slip up on [her]" when she was in her yard alone. Both from her own eyes and from monitoring cameras on her property, she estimates that "99% of [the trespassers] are men." Smith states she no longer feels safe.

Stanford Conoly, also of Kinney County, describes much the same. He describes the risk to cattle from eating the trash the trespassers leave behind. He states that, since the trespassers were breaking off the spigots on water tanks, he installed faucets, so that they could turn the water on and off. The trespassers "left them on every single time." Conoly reports that he and his wife have both been confronted by trespassers at their home. He also reports being out on the ranch with his son and having a group of fifteen trespassers "fan out around us as we were working."

16

Tiffani Sanchez, of Kinney County, states that, on the afternoon of September 21, 2023, her five-year-old son found two male trespassers in their back yard. The trespassers were part of a "bailout" near her home.[11] Sanchez called the Kinney County Sheriff's Office. The trespassers could not be found. The two trespassers, and three others, returned to her home at 10:00 p.m. They were all male and all dressed in black. They rang the doorbell. The trespassers initially insisted that she help them. They left only when she said the sheriff was on his way.

Laura Allen, a fifty-year resident of Val Verde County, describes cameras on her property showing armed trespassers. She states that "almost all" the trespassers were "adult males dressed in full camouflage and carrying backpacks." Allen describes multiple car chases across her property. One of them resulted in the arrest of two cartel members smuggling six migrants, "one of whom was a convicted sex offender."

Time and again, the affidavits state that the majority of trespassers are male. None of the affiants testify to being accosted by female trespassers.

The trial court relied on these affidavits.

## IV. Selective Prosecution

In *Ex parte Aparicio* and its progeny, our sister court has held that there are three steps to evaluating a habeas claim of selective prosecution based on an alleged equal protection violation.[12] The burden is on the claimant to present a prima facie case satisfying the first two

---

[11]*See United States v. Zapata-Ibarra*, 212 F.3d 877, 882 n.2 (5th Cir. 2000) ("A bailout is when the vehicle pulls over to the side of the road or appears to be sort of back and forth on the lane to try to look for a place that is not fenced in or maybe doesn't have any obstacles so he can run on the side of the road, and so everybody can bail out and run."). The affidavits contain numerous accounts of bailouts.

[12]*Ex parte Aparicio*, 672 S.W.3d at 708; *Del Campo-Chavez*, 674 S.W.3d 714; *Gomez*, 2023 WL 7552682, at *5.

steps: "[t]he defendant must demonstrate that the prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Ex parte Aparicio*, 672 S.W.3d at 708 (quoting *United States v. Armstrong*, 517 U.S. 456, 457 (1996)). Once the prima facie hurdle has been cleared, the third step is an evaluation of the State's justification for its actions.[13]

On the second step, our sister court sees discriminatory intent when "*a discriminatory purpose has been a motivating factor*" in the exercise of prosecutorial discretion.[14] *Ex parte Aparicio* quoted "a discriminatory purpose" word-for-word from a 1977 equal protection decision of the United States Supreme Court.[15] The 1977 case, though, had other words, among them words which indicate that this is a "sensitive inquiry" which includes among its non-exhaustive considerations, whether the record reveals "a clear pattern, unexplainable on grounds other than" a prohibited discriminatory intent.[16] The Supreme Court said that such a pattern would be "rare."[17]

The 1977 case was not the Supreme Court's last word. In 1982, the Court, in explaining the very same legal test, used the words "*the* motivating factor."[18] In 1985, the Court used the

---

[13]*Ex parte Aparicio*, 672 S.W.3d at 708 ("Once the defendant establishes a prima facie case of selective prosecution in violation of equal protections rights, the burden shifts to the State to justify the discriminatory treatment."); *Ex parte Vazquez-Bautista*, 683 S.W.3d at 513.

[14]*Ex parte Aparicio*, 672 S.W.3d at 714 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

[15]*Id.*

[16]*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

[17]*Id.*

[18]*Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 544 (1982) (emphasis added).

18

words "because of."[19]  Even more recently, in 2021, the Court explained the "motivated by a discriminatory purpose" test in terms that permit a broad view both of the conditions giving rise to the act, and of who constitutes the actor.[20]  For example, the Court approved a district court's consideration of "the historical background and the sequence of events leading to" the challenged action.[21]  Likewise, rather than giving controlling weight to the motives of individual proponents of a statute, the Court examined the evidence regarding the motives of the legislature "as a whole."[22]

There is also Texas Supreme Court authority on the motivation prong of the prima facie equal protection case.  *Ex parte Aparicio* does not consult its guidance on the motivation inquiry.[23]  I would.  *Ex parte Aparicio* and its progeny do cite to *Bell v. Low Income Women of Texas* for two propositions:  (1) that the Texas Equal Rights Amendment supplements federal equal protection guarantees and (2) that, once a prima facie case has been made, the Texas Equal Rights Amendment (ERA) subjects the State's actions to "strict scrutiny."[24]

---

[19]*Wayte v. United States*, 470 U.S. 598, 610 (1985).

[20]*Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321, 2332, 210 L.Ed.2d 753 (2021).  *Brnovich* was a voting rights case in which the Supreme Court assessed "discriminatory purpose," *id.* at 2348, for a Fifteenth Amendment claim by using "the familiar approach" used in the very same equal protection precedent on which our sister court relies, *id.* at 2349 (citing *Arlington Heights*, 429 U.S. at 266–268.

[21]*Brnovich*, 141 S.Ct. at 2349.

[22]*Id.* at 2349–50.  The Supreme Court also noted that "partisan motives are not the same as [prohibited discriminatory motives]."  *Id.* at 2349.

[23]*See Ex parte Aparicio*, 672 S.W.3d at 713.

[24]*Id.* at 716 (citing *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 257 (Tex. 2002)).

19

*Bell*, though, also addresses the burden on the claimant at the "because of" stage. *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 257 (Tex. 2002). Similar to the test described above, *Bell* used a three-step process for claims under the Texas ERA, one of them being "whether equality was denied *because* of a person's membership in a protected class of sex, race, color, creed, or national origin."[25] On this "because of" inquiry, *Bell* found federal authorities to be "helpful guidance."[26] In particular, *Bell* looked to the same 1977 United States Supreme Court case from which *Ex parte Aparicio* quoted.[27] Further, *Bell*'s terminology for the motivation inquiry, "because of," has also been used by the Supreme Court.[28]

*Bell* evaluated the State's abortion funding program "as a whole," including the "interplay" with the federal system and federal funding.[29] *Bell* did not merge effect and intent; though "only women can become pregnant[,]"*id.* at 258, *Bell* held that "we do not believe the discouragement of abortion through funding restrictions can, by itself, be considered *purposeful* discrimination against women as a class," *id.* at 263 (emphasis added). *Bell* acknowledged that the adverse effect on women could give rise to an inference of discriminatory intent, but held

---

[25]*Bell*, 95 S.W.3d at 257 (quoting *In re McLean*, 725 S.W.2d 696, 697 (Tex. 1987)).

[26]*Id.* at 259.

[27]*Id.* at 260 (citing *Village of Arlington Heights*, 429 U.S. at 264–65).

[28]*Wayte*, 470 U.S. at 610. Notably, *Wayte* held that "[f]ew interests can be more compelling than a nation's need to ensure its own security. . . . Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning." *Id.* at 611–12.

[29]*Bell*, 95 S.W.3d at 263. The record here shows that, as of November 14, 2022, "Texas ha[d] devoted more than $4 billion of *Texas* taxpayer dollars . . . to secure the border and enhance public safety." (Emphasis added). The record before us shows that Texas was seeking, but had not obtained, federal reimbursement for those expenditures.

that "an inference is a working tool, not a synonym for proof."[30]  Accordingly, *Bell* found that, "[w]hatever one might think of the legislative policy choice . . . plaintiffs have simply failed to demonstrate that it reflects a purpose to discriminate because of sex."[31]  Consequently, the *Bell* claimant failed to meet the "because of" test.[32]

Crucially—and expressly—*Bell* used "because of" at the second step of the process to determine whether or not strict scrutiny applied at the third step in the process, justification for the State's action:  "[b]ecause the [action on review] does not discriminate 'because of' sex, we judge the classification by the more deferential rational-basis standard of review."[33]  In sum, *Ex parte Aparicio* cited *Bell* to place the State under strict scrutiny without using *Bell*'s "because of" test to see if strict scrutiny was warranted in the first place.[34]

## V.     The Abuse of Discretion Standard of Review

Our sister court states the abuse of discretion standard in a way that, by the words used, might afford too little actual discretion to the trial court.  Our sister court states that "we defer to the trial court's assessment of the facts *when* those facts turn on an evaluation of credibility and

---

[30]*Id.* at 264 (quoting *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 n.25 (1979)).

[31]*Id.*

[32]*Id.* ("the TMAP funding scheme does not discriminate 'because of' sex") (quoting *Sullivan v. Univ. Interscholastic League*, 616 S.W.2d 170, 172 (Tex. 1981).

[33]*Id.* (quoting *Sullivan*, 616 S.W.2d at 172).

[34]*Ex parte Aparicio*, 672 S.W.3d at 716; *Gomez*, 2023 WL 7552682, at *5 (petition for discretionary review filed (Dec. 15, 2023)); *Del Campo-Chavez*, 674 S.W.3d at 718.  Consequently, I would consider the *Bell* "because of" analysis controlling when strict scrutiny is sought under the Texas ERA.  I would also consider it persuasive, at a minimum, under the federal test, and quite possibly controlling should either of the State's highest courts find that aspect of the Texas ERA analysis to be identical to the federal analysis.  Further, given that the Texas Supreme Court has spoken to the Texas Constitution, I would take guidance from that before consulting decisions regarding a federal statute.  *See Ex parte Aparicio*, 672 S.W.3d at 715 (discussing precedent regarding a federal statute).

21

demeanor." *Ex parte Aparicio*, 672 S.W.3d at 707 (emphasis added). This raises two questions which matter because this case was submitted on a paper record.

First, would it be correct to view "credibility and demeanor" as a dividing line with trial court factual findings turning on "credibility and demeanor" getting deferential review, but findings not based on "credibility and demeanor" getting no deference? The answer is that "credibility and demeanor" is not that sort of dividing line; where the Fourth Court says "when" the Texas Court of Criminal Appeals has said "especially when." *Diamond v. State*, 613 S.W.3d 536, 544 (Tex. Crim. App. 2020) ("An appellate court affords almost total deference to a habeas court's factual findings when they are supported by the record, *especially when* those findings are based on credibility and demeanor." (Emphasis added)). Thus, *all* of the trial court's factual findings with support in the record are to be given almost total deference. *Id.*

Consequently, "reviewing courts defer to the trial court's implied factual findings that are supported by the record, even when no witnesses testify and all of the evidence is submitted in written affidavits." *Ex parte Wheeler*, 203 S.W.3d 317, 325–26 (Tex. Crim. App. 2006). Deference, already due, and "almost total," is enhanced when the finding turns on an assessment of "credibility and demeanor." *Diamond*, 613 S.W.3d at 544. Notably, our sister court relies on *Ex parte Wheeler*. *Ex parte Aparicio*, 672 S.W.3d at 707 (citing *Ex parte Wheeler*, 203 S.W.3d at 324). Therefore, we read *Ex parte Aparicio* as following *Ex parte Wheeler*, and as being consistent with *Diamond*. On that understanding, we are in accord with the Fourth Court on this first question.

Second, what exactly amounts to a "credibility and demeanor" assessment by a trial court? Here too, *Ex parte Wheeler* provides guidance, noting that a trial court can make credibility and demeanor determinations, even from a paper record of one phase of a proceeding, based on the trial court's prior experience. *Ex parte Wheeler*, 203 S.W.3d at 326 (noting that a trial court could properly bring prior experience with a prosecutor to bear when assessing the proffered reason for the exercise of a preemptory strike). Again, we read *Ex parte Aparicio* as following *Ex parte Wheeler,* and on that understanding are in accord with our sister court.

Likewise, we are in accord with the proposition that, on abuse of discretion review, the reviewing court examines the record in "the light most favorable to the [trial] court's ruling." *Ex parte Aparicio*, 672 S.W.3d at 707.

## VI.    Analysis

Under the *Ex parte Aparicio* approach, once it is established that men are prosecuted while women are not, a habeas claimant has carried the prima facie burden of showing both discriminatory effect and motivation by a discriminatory purpose. This is demonstrated most starkly by *Del Campo-Chavez*. *Del Campo-Chavez*, 674 S.W.3d at 718 (citing *Ex parte Aparicio*, 672 S.W.3d at 714–15 ("Del Campo met his burden by showing that the State only prosecuted men for misdemeanor trespass under OLS.")). That has the effect of merging the two prongs of the prima facie burden into a single prong, satisfied by the same evidence. *See id.* Under that approach, it appears that the affidavits of Regional Director Escalon and the OLS border county residents would not, and could not, make any difference; *Ex parte Aparicio* and *Del Campo-Chavez* dictate a finding that the State's actions were motivated by an

23

unconstitutional discriminatory purpose no matter what evidence the State submits regarding its motives.

Those affidavits and Governor Abbott's proclamation made a difference to the trial court. In its assessment, the State was not acting for improper discriminatory reasons, but to protect not only Texans, but the trespassers themselves, doing so as best the State could on that day with the resources available on that day. Under the abuse of discretion standard, that should make a difference to us as an appellate court. I would affirm the trial court.

Because the *Ex parte Aparicio/Del Campo-Chavez* legal test compels a different outcome, I respectfully concur and dissent.

Jeff Rambin
Justice

Date Submitted: March 5, 2024
Date Decided: April 16, 2024

Do Not Publish

24